## DUFFY *vs.* DUNCAN and LOGAN.

32b    587|
66 AD⁶372|

Allowances and commissions to, and charges against, trustees on their final accounting. General principles upon which the account is to be taken.

Where a trust deed is silent as to the compensation to be paid to the trustees, the law implies an agreement to perform the services for the same allowance which is made by statute to executors and administrators; and the court will allow them that amount.

It is the duty of trustees under an assignment for the benefit of creditors, to keep the trust fund entirely separate and distinct from their own moneys.

If the funds are deposited in a bank they should be deposited to a separate account, and in the names of the trustees as such, to the end that they can at all times be traced and identified.

If trustees mingle the trust funds with their own they commit a breach of trust, and are legally chargeable with simple interest thereon, although they may have made no profit by their use.

In regard to trust property which comes into the hands of the trustees, all that the *cestuis que trust* can claim is, either, 1st. What the trustees may have received for it, upon a fair sale thereof, together with what they may have earned by its use; or 2d. The value of the property at the time it came into their hands.

When the trustees have not derived a profit from the use of property, and the property itself has been lost, by their fault, its value at the time of such loss is the measure of the liability of the trustees.

It is well settled that trustees cannot be permitted to use the trust funds in commercial or other business operations, at the risk of the *cestuis que trust;* and the fact that a share of an item of the trust property belongs to one of several trustees, in his own right, cannot vary the rule.

Rule as to costs, against or in favor of trustees, as between them and the *cestuis que trust,* and as between themselves.

THIS action was brought by the plaintiff in behalf of himself and all other creditors of one Joseph McMurray, who should come in and contribute towards the expense of the action, to compel an accounting by the defendants as assignees of McMurray for the benefit of creditors. The cause was referred to John L. Mason, Esq., by whom an account was stated and upon whose report a judgment was entered directing the payment by the defendants to the individuals named in the decree and declared entitled under the assignment, as creditors of McMurray, of $16,825.47 the balance of the trust fund remaining in their hands. Both parties

excepted to the report of the referee, and both appealed from the judgment thereon.

*F. Byrne,* for the defendants.

*S. B. Brophy,* for the plaintiff.

*W. A. Butler* for *S. Flanagan,* a creditor.

*By the Court,* ALLEN, J.   The objection taken by the defendants, in their first point, that the claims set up in their answer for expenses and disbursements by and demands made against them were counter-claims, and no reply having been put in, that they stood admitted and could not be controverted, was not taken upon the trial and cannot now be urged. But if it had been taken it would have been unavailing. The matters referred to were in discharge of the defendants, and not counter-claims against the plaintiff.   (*Code,* §§ 149,150.)

The defendants next insist that the referee should, on their motion, have dismissed the complaint, on the ground that the plaintiff was estopped and barred from maintaining this action by the proceedings and decree in another action brought by one Ellen Traynor in behalf of herself and all others similarly situated, against the defendants, for an account of the same trust.   That action was commenced by the plaintiff therein as a creditor of McMurray interested in the trust; the defendants answered the complaint and were ordered to account before Judge Mason.   Neither the plaintiff in this action nor any other creditor of McMurray became parties to that, by coming in and proving their debts, or in any other way, and the plaintiff therein died before an accounting was had.   The husband and administrator of Ellen Traynor refused to permit the suit to be revived for the benefit of creditors interested in the assignment, as appears by the statement of the referee.   The practice authorized by § 119 of the code, permitting one or more parties, when the parties are very numerous and it may be impracticable to bring them all before

Duffy *v.* Duncan.

the court, to sue or defend for the benefit of the whole, was familiar in the court of chancery, and was adopted from the practice of that court. It probably was only intended to govern cases which could have been the subject of a suit in equity, and only such cases as would have been within the rule as established in that court. (*Per Duer, J. Habicht* v. *Pemberton,* 4 *Sand. S. C. R.* 657.) But for the convenient rule referred to of allowing one or more to sue for himself, and all others standing in the same relation, who may elect to come in under the decree, all the creditors of McMurray would have been necessary parties to an action against the trustees for an accounting. But as, in an action thus brought by one or more, all have an opportunity of coming in and substantiating their claim before a distribution can be made, it is not necessary to make them all parties. (*Hallett* v. *Hallett,* 2 *Paige,* 15.) During the pendency of an action by one in behalf of himself and all other creditors, any creditor may make himself a party to the action and an actor in it. (*Creuze* v. *Hunter,* 2 *Vesey,* 157. *Herndale* v. *Hankinson,* 1 *Simons,* 393.) Whether a final decree in such action would bar a subsequent action at the suit of a creditor who omitted to prove his claim or make himself a party, need not be considered. (*Good* v. *Blewitt,* 19 *Vesey,* 336.) He would doubtless be bound by the judgment, so far as the trust fund should be disposed of by it, and it may be conceded that so long as a suit was pending, to which a creditor might become a party and in which all the relief asked could be had, another suit would not be permitted. (*Groshon* v. *Lyon,* 16 *Barb.* 461.) Had the plaintiff proved his claim before the referee, under the order of reference in Trayner's case, it would have been almost a matter of course to suffer him to revive the suit for his own benefit. (*Houlditch* v. *Marquis of Donegal,* 1 *S. & S.* 479.) And had he so appeared, the plaintiff could not, had she lived, have discontinued the action. Whether upon her death he would have been compelled to revive that action rather than bring a new one, need not be decided. At

the time of Mrs. Traynor's death she was the sole party to the action, no other creditor having come in, and it was as yet her action and hers alone, and she might have discontinued it. By her death it abated, and it was optional with her representative whether he would revive it or suffer it to be revived in his name. The plaintiff could not have had the benefit of that action. (*Dixon* v. *Wyatt,* 4 *Mad.* 393, 2 *Barb. Ch. Pr.* 42, 67.) It constituted therefore no bar to this action.

The defendant also excepted to the report of the referee for the reason that he rejected two charges, one of $100 and one of $250, for money paid to the assignee. The referee properly disposes of them in his report, by the remark " that there was no evidence showing the necessity or propriety of such payments." The only evidence as to the $100 payment is that it was paid " because McMurray said he could aid the assignees in obtaining a claim upon a judgment which he had recovered against one Robert L. Patterson for about $2000," and upon which nothing was ever collected ; an easy way of acquiring money belonging to creditors. The $250 was paid because " Mr. Byrne recommended that McMurray should be sent to Washington, as he was acquainted with the matter, and endeavor to collect the claim" against one Clarke. The evidence shows that McMurray in fact knew nothing of the matter, and did not go to Washington, but took the money to remove himself and family to St. Louis.

The referee allowed the defendants commissions upon the moneys received and disbursed by them, after the rate allowed by law to executors and administrators. The defendants claimed five per cent upon the whole amount received by them, making $3,667.85, instead of $833.57, allowed by the referee. The referee, in fixing the compensation of the defendants, followed *Meacham* v. *Sternes,* (9 *Paige,* 398,) which is authoritative with us, and entirely satisfactory. It is there held that if the trust deed says nothing as to the compensation of the trustees, the law implies an agreement to perform the services for the same allowance which is made

Duffy *v.* Duncan.

by statute to executors &c., and the court will allow them the same compensation as executors and administrators receive. The trust deed here is silent as to compensation.

The next exception of the defendants is to the amount allowed the defendants for clerk hire. The claim made was $1350, or at the rate of $250 per annum from the date of the assignment, December, 1850, to July 1st, 1857, with the exception of a single year. The referee found as a fact, and the finding is warranted by the evidence, that for the first year after the assignment the duties of the clerk were onerous, but that after that time the services were very trivial. Indeed for several of the quarters the only entries in the accounts of the trustees are the payment of the clerk's salary, and for some years the only entries are the payment of office rent to one of the trustees, the clerk's salary, and the costs and fees of counsel; during the time the clerk also acted as clerk for one of the trustees in his individual business; and during a part of the time was his partner. The referee allowed $500 for the first year's services, and $100 for all subsequent services; and the allowance was liberal when it is remembered that it is taken from a fund belonging to creditors of an insolvent estate.

The claim of the defendants for office rent paid to Logan, one of the trustees, was properly disposed of by the referee. Logan partitioned off a room 10 by 12 feet, at the end of his store, in which his own business and that of the trust was transacted. I doubt if any thing should have been allowed, and whether the commissions did not cover this charge, so long as an office was not required for this business exclusive of all other business. The defendants charged $550, and at the rate of $100 per annum. The referee allowed the claim for a single year, which was all that they were reasonably entitled to. It is said that by mistake only $50 were in truth allowed. If this is so, no injustice has been done; but it is not certain that the error is not in transcribing or printing the schedule annexed to the referee's report.

The defendants next object to the amount of interest with which they are charged by the referee, the result of the method adopted by the referee in the statement of the accounts. A conclusive answer to this objection is that there is no exception to the mode of computation of interest, or to the sums upon which, or time from which, interest was computed. Had the attention of the referee been called to the subject, and the claim now made by the defendants urged before the referee, any errors in the details could have been corrected by him in the final settlement of his report. But if the question were before us, and we could receive the statement of interest as made by the referee, I should be of the opinion that no injustice had been done the defendants. The assignment was dated December 2d, 1850, and up to March 7th, 1851, the assignees had received $58,523.38, and October 10th, 1851, they received $14,833.65, making $73,357.03. Up to November, 1851, they had disbursed but $57,117.60, and up to April, 1852, their disbursements were only $61,-149.84, and for the next five years their disbursements were but $1231.85. Had the referee charged interest upon the moneys in the hands of the assignees at the expiration of the year after making the assignment, as he well might have done, the result, even after allowing the defendants all that they now claim, would have been less favorable than it now is.

The referee charged interest on the balance on hand on April 1st, 1852. The claim of the defendants is, 1st. That they should have been allowed interest on the commissions. The answer to which is, they were not ascertained until their accounts were adjusted, and it was in their power to close them and with them the trust at any time; and 2d. The interest should have been allowed upon the small payments made during the five last years of the trust. But 1st, as before said, if an interest account is to be stated with precision, the defendants should be charged with interest, which would overbalance this claim, if allowed; and 2d. These payments

Duffy *v.* Duncan.

were a part of the expenses of the trust, and the account not adjusted until the statement of the account by the referee.

The plaintiff waives the exception taken by him to the computation and statement of interest.

The defendants further object that no interest should have been charged against the defendants. It should be borne in mind that the trust fund and assets were, very early after the assignment, converted into money, and a large sum remained in their hands, for many years, without any effort on their part to distribute it among their *cestuis que trust.* Logan admits that he used the moneys remaining in his hands, and the sum received by Duncan was mingled with his individual moneys and deposited in bank to his individual credit. It was the duty of the trustees to keep the trust funds entirely separate and distinct from their own moneys. If deposited in a bank it should have been deposited to a separate account and in the name of the trustees as such, to the end that the fund could at all times be traced and identified. By mingling the trust fund with their own they committed a breach of trust, and were legally chargeable with simple interest thereon, although they may have made no profit by their use. They did create a credit at the bank by their deposit. (*The Utica Insurance Company* v. *Lynch,* 11 *Paige,* 520.) The defendants were negligent in not paying over the money or in not loaning or investing it so as to render it productive, and upon this ground, if upon no other, were properly charged with interest after April, 1852. (*Dunscomb* v. *Ex'rs of Dunscomb,* 1 *John. Ch.* 508.) And see *Brown* v. *Rickets,* (4 *John. Ch.* 303,) in which case the trustees, as in this case, testified that they were ready at all times to have paid the plaintiff out of the trust fund.

The defendants, as assignees of McMurray, claimed and received from the treasurer of the state, upon the warrant of the comptroller, several thousand dollars under the provisions of chapter 534 of the laws of 1851, for money paid under protest, by McMurray, to the mariner's fund, and which by

the act referred to was directed to be paid " to the merchants masters or owners or their assigns, of the several vessels, on account of which said moneys" had been paid. The defendants now claim that of this amount $3107 was for money received by McMurray of one James Miley, and was paid by McMurray to the state as the agent of Miley, and that this amount should have been deducted from the sum charged to the defendants. A conclusive answer to the objection is that there was no evidence of the truth of the allegation, and no legal proof upon which the referee could have decided that any part of the money paid by McMurray to the state and refunded to the defendants as his assignees was the money of Miley. The only witness is the clerk of McMurray, Collins, who swears that his only knowledge of the facts is derived from the books of McMurray, and that he had no knowledge that Miley paid any money to McMurray, or that he was the owner or agent of the vessels consigned to McMurray and in respect to which the money was paid. In the absence of evidence that Miley had any legal or equitable claim to the fund, the referee very properly charged the defendants with that which was apparently trust money, and which they claimed and received as assignees of McMurray, and treated as a part of the estate of the debtor. Again ; there is no ruling of the referee in respect to the Miley claim. Miley made a claim before the referee, but failed to prosecute the claim, and gave no evidence in support of it. It was dismissed for the want of prosecution, and an omission to comply with the order of the court requiring him to contribute to the expenses of the suit. The defendant cannot object to the regularity or propriety of this proceeding, and Miley has not appealed. What would have been the rights and liabilities of the defendants if they had proved that the sums claimed were in truth paid by McMurray as the agent of Miley, and from moneys furnished by him for that purpose, need not be considered. It is sufficient to say that it would by no means follow that receiving it as trustees and not having been called

to account by Miley, they would be excused from accounting for it under the trust.

Evidence was given of a payment of $475.15 for repairs to the steamer John Jay, but it does not appear by the answer of the defendants, or by any proceeding in the case, that the defendants claimed this payment as a credit, and in their discharge as assignees. Neither does it appear that the referee was asked to allow it, or that he made any decision covering it; and there is no exception in the case to any ruling of the referee in respect to this claim. This item is not contained in the account of the defendants appended to their answer. The point made upon the argument, founded upon the omission of the referee to allow the payment to the defendants, is not therefore tenable. It is possible that the defendants might have made a case entitling them to this allowance, but they should have laid a foundation for it in their account rendered, and by a distinct claim before the referee.

A further objection in behalf of the defendants to the report and judgment is, that but three fourths of the costs and expenses of defending the steamer John Jay against certain proceedings taken against her in the courts of the United States were allowed to the assignees, while the remaining one fourth was adjudged as properly chargeable to the defendant Logan, who was one fourth owner of the steamer in his own right. The facts are briefly but substantially stated in the report of the referee. McMurray purchased the vessel in May, 1850, for himself and Logan, taking the title in his own name and giving a chattel mortgage for a part of the purchase money. The vessel was run for the benefit of McMurray and Logan until the assignment by McMurray, and the libel was filed to foreclose the chattel mortgage, and was dismissed by the court for want of jurisdiction. A bare statement of the case shows the propriety of charging Logan with one fourth of the expense of defending the action, and to this extent relieving the trust estate. To charge the estate with all the costs would be grossly unjust. It is said that Logan,

when he took title from McMurray, did not know of the existence of the mortgage. If this were so and he was defrauded by McMurray, his claim is against McMurray, and he cannot right himself by seizing the fund set apart for his creditors. Another reason why he should not be indemnified out of the estate and at the expense of the creditors is, that, having been successful in defending the vessel against the claim, he had no claim against McMurray and still less against the estate. He did not lose title to the vessel, and was not properly subjected to any costs in the defense of his title. Neither McMurray nor his estate should be made to pay for a suit brought without cause against the vessel, or Logan, as claimant.

Both parties except to the decision of the referee in stating the account with the trustees in respect of the steamer John Jay and her earnings while employed by the assignees. At the time of the assignment the three-fourths interest of the assignor was not worth the incumbrance upon it, and was of no value. The assignees repaired her at joint expense and employed her as they could until she was lost, when they settled with the underwriters, receiving from them a sum agreed upon in satisfaction of the policy. There is no claim that they did not receive all they were entitled to demand upon the insurance. Upon a statement of an account of their operations with and expenses in and about the vessel, and after crediting all sums received from the underwriters and for earnings, and from all other sources, there was a loss to the assignees of about $2500. Some years after this they bought in the notes of McMurray outstanding, and to secure which the chattel mortgage had been given, for $300. The referee decided 1st. That the assignees were only chargeable with the value of the vessel at the time they took her under the assignment, and to this the plaintiff excepts; and 2d. That the defendants were not entitled to be reimbursed out of the trust fund for any part of the losses sustained in run-

ning the steamboat: to this the defendants except. Both exceptions must be overruled.

All that the *cestuis que trust* can claim of the trustees is, either 1st. What the trustees may have received for property, upon a fair sale, together with what they may have earned by its use; or 2dly. The value of the property at the time it came into their hands. When the trustees have not derived a profit from the use of property, and the property itself has been lost by the fault of the trustees, its value at the time of its loss is the measure of the liability of the trustees.

In this case the trustees have made nothing by the use of the vessel. She was of no value at the time of the assignment, and could not have been sold for any sum; so that the creditors have lost nothing by the omission of the trustees to sell. If she had been lost, without an insurance, no question could have arisen. But it is said that the defendants have received the amount of the insurance, and as they have not paid the incumbrance they should account for this. But the plaintiff asking equity must do equity; in other words, while enforcing an equitable claim care must be taken not to violate the first principles of equity. The evidence is that the vessel, at the time of the assignment, was unseaworthy, and that her principal value at the time of her insurance and loss was made up of the repairs put upon her by the defendants. If the defendants are to be charged with the amount received from the underwriters, they should be credited with what they have paid to make the vessel insurable, which would open all their accounts with the vessel. But the plaintiffs further urge that as the defendants purchased the debt which was a lien on the vessel, for a nominal sum, they should be charged with the value of the vessel less this sum. This would have been right had the vessel been *in esse* when they bought the claim. But the vessel had been lost and the liability of the defendants fixed. The debt was no longer a lien on any property, and by the purchase only the estate at large was relieved *pro tanto*. The defendants should not, in

the absence of fraud, be charged beyond the value of the property received by them. And this does ample justice to the *cestui que trust*, who ought not to speculate out of the defendants.

That trustees cannot be permitted to use the trust fund in commercial or other business operations at the risk of the *cestui que trust*, is too well settled to require argument or authority to support it; and the fact that one-fourth of the vessel was owned by one of the trustees in his own right cannot vary the rule. As trustee of the three-fourths he was bound to sell that interest, or if he violated his duty as trustee by omitting to sell, he could not subject the trust estate to the risks incident to the business in which he might choose to employ the vessel. (*Willard's Eq. Jur.* 188.) The referee properly rejected the claim to be reimbursed from the trust estate three-fourths of the loss resulting from the use of the vessel.

The last ground urged by the defendants, for a reversal or modification of the judgment, is the refusal of the referee to charge the estate with the costs of defending the suit brought by Ellen Traynor against the trustees. The main object of the suit was to charge the defendants with the value of the store No. 69 South street, a part of the assigned property which had been purchased by Logan at the assignee's sale. The purchase by Logan was a breach of trust, and the court ordered a resale of the property, as of course. Had the suit been prosecuted to a final decree the court would have charged the trustees, personally, with the costs. The suit was rendered not only proper but necessary by the wrongful act of the trustees, and the redress of the wrong should not be at the expense of the trust. The referee properly says in his opinion, "where a trustee purchases the trust property, he purchases it subject to this right, and any costs to which a *cestui que trust* may be put in obtaining a resale under the decree of the court are properly chargeable to the trustee who has occasioned them." (*Sanderson* v. *Walker*, 13 *Ves.*

601. *Van Epps* v. *Van Epps*, 9 *Paige*, 238.) This claim was properly rejected by the referee.

The plaintiff objects to the allowance of a credit to the defendants of $1068.05 paid by them to Edward Fiske. The payment was thirty per cent of the sum received from the state under the act of 1851, for hospital moneys refunded. Fiske was employed by merchants in New York city to procure the passage of the law, under a promise to pay him thirty per cent of the amount received; he agreeing to pay Mr. Webster for the argument of the cause in the supreme court of the United States, in which the exaction of the moneys by the agents of the state had been pronounced illegal. There was reason to suppose that McMurray might have been a party to this agreement, but it was not proved. But it was proved that other parties benefited compensated Fiske in pursuance of the arrangement, and as the estate had an equal benefit in the services, it was reasonable that it should bear an equal share in the burthen. The assignees paid in good faith, and the compensation was not deemed unreasonable in amount, by others similarly situated, and acting for themselves. It would have been unjust to the assignees to have disallowed this credit.

The plaintiff also objects to the allowance of any part of the costs and counsel fees expended in the defense of the John Jay. But the vessel was a part of the assigned property, and it was the duty of the trustees to protect it, to the end that it might be made to bring the highest price and protect the residue of the estate from the liability to contribute to the payment of the mortgage debt. As the good faith of the assignees in incurring the expense is not impeached, the allowance was proper.

The costs were in the discretion of the court below, and as there is no charge in the complaint of fraud or wanton neglect of duty on the part of the defendants, we cannot say that the discretion was abused; especially as it was a proper case for coming into court for the settlement of the accounts. If the defendants had not been called into court by a credi-

tor they would have been obliged to call the creditors into court in an action by themselves for the closing up and settlement of the trust.

The last exception to be considered is that of the plaintiff · to the allowance of the claim of Simon Flanagan as a debt payable out of the trust fund. Flanagan was the agent of the assignor, at Saratoga Springs, for the sale of passage certificates or tickets from Ireland to New York, and sold several and remitted the moneys received to McMurray. The certificates were dishonored after the failure of McMurray, and Flanagan repaid the money to the parties holding the certificates. The referee held Flanagan a creditor to the amount so paid by him, and in this there was no error. · The holders of the certificates were clearly creditors of McMurray, and could have proved their debts under the order of reference; and Flanagan, by payment of the sums, succeeded to the rights of the several holders. It did not require a formal assignment. He took the certificates, and thus by delivery became the holder of them as vouchers. Situated as he was, and holding the peculiar relation he did to those whom he had induced to purchase the certificates, he could not be called a volunteer in refunding the amounts received.

The judgment must be affirmed, and as between the plaintiff and defendants, as each have appealed, as against the other, and neither has succeeded upon any of the exceptions taken, neither is entitled to costs, either against the other or to be paid out of the fund, but each must pay his own costs.

The appeal against Flanagan is not sustained, and as he has been brought into court to defend a very honest and proper claim, he is entitled to the costs of the appeal, to be paid by the plaintiff. Judgment is therefore affirmed, with costs to Flanagan, to be paid by the plaintiff, and without costs either to the plaintiff or defendants as between each other or as against the fund.

[New York General Term, September 17, 1860. *Sutherland, Leonard* and *Allen,* Justices.]